The court will proceed to the fourth case, United States v. Ballard. Mr. Miller. May it please the court, counsel. Eugene Miller on behalf of the United States. The United States requests that this court reverse the order of the district court, granting the defendant a new trial, reinstate the verdicts of the jury, and remand for sentencing. The defendant was convicted of three counts of bank fraud following a jury trial. The evidence at trial showed that the defendant submitted false sworn contractor statements to the title insurance company, claiming that he had constructed one residence and built a second story on another residence, when in fact he had done neither. Did he ever finish the first one? He did not even really start the first one. No, I mean the... Oh, I'm sorry. The one, whatever it was, up on a hill or something like that? He was attempting to finish it at the time the bank alert... What's the name of that one? ...learned of the fraud, and then I believe the bank stepped in... Stone Hill or something like that? Stone Fence, Your Honor. Okay. But did they ever finish it? It was finished, again, I believe the bank stepped in at the very end and finished that property as part of the overall... Okay. I'm just wondering, because he got all this extra money, I just wonder if he applied it to the house or not. And that's correct. What he did was he used the money, hundreds of thousands of dollars, for his own benefit, some of which was to attempt to finish the over-budget property at Stone Fence. And ultimately, of course, then the bank is left with no collateral on those other properties on North Center Street, because he didn't build any residence on one and he didn't add a second story to the other. And those facts really are not disputed by the defendant. And importantly, at trial, the bank loan officer who's at issue here was one of 13 witnesses who testified, and as we detail in our brief, was a witness whose testimony was not necessary to establish these facts and convict the defendant. Now, after the trial, the defendant filed a motion requesting a new trial based on a 2009 recorded statement of the bank officer, which the defendant discovered the day after the 2016 trial was completed. And even though those 2009 statements didn't relate to the bank officer's trial testimony or to the issues at trial, the court did find that there were four specific statements in that recording that might be useful for impeachment and therefore ultimately granted the defendant a new trial. The United States admits that the District Court clearly erred, both in finding that those statements were favorable at the defendant's 2016 trial, and more importantly, in finding that those statements, even if they had some impeachment value, were material to any issue at trial. We detail in our brief why none of the four statements are favorable to the defendant. So I'll focus right now on the materiality argument, which we believe clearly requires reversal in this case. For materiality to apply here, the court would have to be convinced that the result of the trial would have been different if these statements had been disclosed prior to trial, thus undermining confidence in the verdict. And that's the defendant's burden to establish, and we submit that was not established in the District Court. First, of course, if the statements are not favorable, and we submit that they're not, then they couldn't be material. If they're not at all favorable to the defendant, they would not change the outcome of the trial. But even if they had some slight impeachment value, on the facts of this case and based on the trial record, they would not undermine confidence in the verdict based on the overwhelming evidence of guilt, which really is not disputed by the defendant, and based on the relative lack of importance of the testimony of the bank loan officer. One of the defenses that was presented at trial was the defendant's claim that he didn't read the sworn contractor statements before he sent them to the title insurance company. And this defense has nothing to do with the testimony of the bank's loan officer. Joe Grant? Joe Grant, correct. The sworn contractor statements were submitted to the title insurance company. And in fact, during cross-examination of Grant, the defense pointed out that he had no idea who signed the sworn contractor statements, how they were signed, when they were signed, why they were signed, or where they were signed. Why is this decision so much based on the title insurance as opposed to the bank? You know, banks make loans. Title insurance, you know, they have other obligations. They've got to make sure you've got a clear title. The way the loan was dispersed, this was a construction loan for all these loans. So the way they were disbursed is the loan was approved by the bank, but money was not dispersed until the defendant, in this case, submitted to the title insurance company sworn contractor statements representing that work had been done. So once that's represented to the title company, the title company then forwarded that to the bank, who would disperse the money to the title insurance company, who would then wait to disperse the money until all the various contractors came in and signed lien waivers, in the case, to get their money. And in this case, the defendant himself was the general contractor on his property and also did a lot of the subcontract work, so he often was the person then who was coming to the title insurance company after he had submitted the false statements and then signing lien waivers so he could be paid for the work he claimed he had done on the two properties, work that he had never done. So that's why the actual false statements that were submitted by the defendant in this case have nothing to do with the testimony of the loan officer, because the loan officer didn't know as far as when, how, why those false statements were submitted to the title insurance company. He then just received them from the title insurance company and approved disbursement of the funds. Didn't at some point a bank person went out and found out that this was an empty lot as opposed to a house? That's exactly right. When they drove by, the defendant was not making his payments, and a bank, Mark Kainer, went out to drive by the two properties where, according to the bank, understood there was going to be a house on one and a second story on a renovated building on another and went out and it was just an empty lot on the one house and there was no second story on the other house. And again, those facts are not in dispute, which is why the prior 2009 statements, ambiguous statements, we would state of the loan officer are just not material to any issue at this trial. In addition to having nothing to do with the submitted sworn contractor statements, Rule 608B counsels that extrinsic evidence, which these 2009 recordings would be, are not admissible at trial to attack the truthfulness of a witness. So even at a retrial, a defense counsel could ask questions about information and then he would be stuck with the answer. And in fact, as we detail in our brief, the loan officer has denied the accusations that relate to the 2009 recording. So the recording wouldn't be admissible under 608B. So it's not material. Well, there's one thing that confuses me, and maybe you can answer when he gets up here, and that is where apparently Ballard is saying that Grant knew all along that this stuff was phony. And that's the second defense which I wanted to address. That's exactly correct. Because it seems to me that's almost like an admission. It is. It's an admission of motive. What the defense claimed was that Ballard was getting pressure, the defendant was getting pressure from the bank to complete that stone fence property, and that as he was getting pressure that the loan officer said to him after he expressed, well, maybe if I could get money from these other loans and put it in stone fence, that the loan officer said, do what you've got to do. Now, the loan officer denies that, but let's just even take that at face value, that the loan officer said to him, do what you have got to do. As we detailed extensively pretrial in the district court, that is not a defense to bank fraud. That would mean that the loan officer was complicit in the bank fraud. That's evidence of the defendant's bank fraud, but it's not a defense to bank fraud, which makes the loan officer's credibility immaterial. Let's say if he's complicit, you've got to be complicit with somebody else, and if he's complicit with the fraud, it seems to me it's admission of the fraud. Agreed, Your Honor. And on that note, I will reserve the rest of my time for rebuttal. Thank you. Thank you, Mr. Miller. Mr. Beaumont. May it please the Court, Counsel. Good morning. First of all, well, I want to start right at the heart of it. Nobody was suggesting there was fraud, anybody was complicit with the fraud. What the facts of the case are, well, at least from my client's perspective and what he told the government when they showed up at his doorstep at 8 o'clock in the morning to interrogate him was that he told Grant that the only way he'd be able to finish that property was if he used proceeds from the other loans on that property. All four loans came from the same bank, and that Grant was aware of the fact that he would and Grant told him, do what you have to do. That's the whole point. That was the basis of our good faith argument and his lack of intent to defraud anybody. That's the whole point. So the good faith is that he did use the money on a different project. Correct, that he used the money. The good faith was we didn't intend to deceive anybody. We didn't intend to deceive the bank. We told the bank that we're going to take that money that was designated for that property, say property C, and put it on Stone Fence because that's the only way we could finish the Stone Fence property. Otherwise, we wouldn't be able to finish it. Now, counsel suggests that there's undisputed about the money. The money went in the Stone Fence. There's no suggestion that my client walked away with $100,000. That money from these other projects was used to complete the Stone Fence project. So he did complete it then? Yes, it was completed. No, not was completed. He completed it. He says the bank completed it. That's not true. He completed it, and it was up for sale, and then the bank realized that these other properties weren't completed as whoever thought. But the point being is my client had absolute good faith and did not intend to defraud anybody, and this information about Grant should have been provided to us pre-trial. Now, they suggest, well, he's one of 13 witnesses. Well, I would suggest when my client was interviewed on the first, at the first, when this investigation began, he told the agent that I told Grant, in essence, I told Grant that's what I had to do, and that Grant implicitly said do what you got to do. The only person they called as a witness in the grand jury of all these witnesses they claimed to have is Grant, and they specifically asked him that fact because they knew very well that our good faith defense would rely on the ultimate trial testimony of Grant. If Grant would have came in the court and said, yes, I told him to go ahead and do that, I don't think they would have had a case. So that's the witness they called in the grand jury to lock in his testimony, and supposedly, as far as we know, they never even talked to this man, which always seems suspicious. I specifically, on several occasions, asked them for all the material pertaining to Grant, and that was never provided, this investigation of Grant that the government conducted and these undercover recording of the grant that the government conducted, that was never given to us. We had no idea that that took place in the first place. And what Grant, and the reason it's significant, and the reason the district court felt that there's a good chance we might have gotten a different trial is because, clearly, the two people that decided that Grant, one, was given immunity, and two, given a pass from prosecution in that earlier investigation, were the two people sitting at counsel table, the prosecution table, Mr. Miller and Mr. LeBow. So now when Grant gets up to testify at the trial, is it likely he's going to say, looking square at the two people that decided he's not going to get prosecuted and he's given immunity, looking at those two people, he's going to say, yes, you're right, Mr. Beaumont, I told your client that he could do that. There's no way that's going to happen. I should have been able to ask him what his bias are, and is he indeed not biased by the fact that these two individuals gave him a pass from that investigation. And that's what they did, because what they're investigating him for, which we had no idea about, was that he aided and abetted and probably conspired with Scott Fitz, the undercover informant with the recording, he aided and abetted and conspired with Scott Fitz to want to obstruct justice, because what Scott Fitz did apparently is got three or four loans, three loans I think it was, one loan from the bank but got the payment from the loans, the proceeds, in $9,000 increments, so it wouldn't trigger any cash requirements. The purpose of which apparently was to get this money to replace the money he had stolen while he was a police chief, which caused the investigation, the primary investigation in the first place. So the point being is he told Grant, I don't want to get, I think the loan was $35,000 if I'm not mistaken, the point is there are four checks and they're all made in increments under the reporting requirements. $110,000. And now Grant, who's been a banker at this point in time for 10 years, who apparently I would assume understands structuring, understands money laundering, agrees to cash the checks the way Scott Fitz wants to cash based on the less than $10,000 increments, and then these people find this out because they have the checks, one of which Grant cashed himself, and they decide not to charge him. And that's fine. That's their decision to make. But the point is I should have known that at trial. I should have been asked, Mr. Grant, at trial, isn't it true that these very people, weren't you investigated by these people, and don't they hold the keys to your liberty, and don't they still hold the keys to your liberty? So the jury should be able to weigh as to whether or not Grant was biased in the first place when he denied what my client said he said. That's the point. My client, these statements that were made to the bank, and by the way, the title company acted as an agent of the bank. In essence, it was a transaction between my client and the bank. Title company was in the middle. But these statements being made from my client's perspective, I already told them that if I'm going to complete this project, the stone fence project, I have to take materials and resources from the other three. Once I get the stone fence project completed and sell that, I can use that money and then complete the other three projects. So the point being is Grant held the keys to that defense. Grant, if he would acknowledge it, I suspect we would have found him not guilty. Now, I don't expect him to acknowledge it, but the point is the jury could have at least assessed whether or not this other criminal investigation that he was a subject of had any bearing on his now testimony denying it. And this stuff about him being one of 13 witnesses is ridiculous because, like I said, they called him at the grand jury for the specific purpose of countering any good faith defense that I may be able to raise. So all of that is going to be enough to reverse the jury's verdict? Yes, I think certainly. And the district court felt that certainly there's a good chance or a chance that that could have had reasonable, whatever the language is, a reasonable belief that that could have happened because the point is that the court who oversaw the trial saw that the only evidence, the solid evidence that the government had against our good faith and our lack of intent was the testimony of Grant. And we couldn't, and I didn't know anything about his criminal conduct. This bank, in all honesty, was operated by a bunch of crooks, the president, another loan officer, other people gone to jail. But I had nothing pretrial to suggest that Grant himself was involved in any of this shenanigans at the bank. I knew nothing about that, and there's no way reason why I should have known about that. So I couldn't actually challenge his credibility. Throughout trial, I brought up the fact that the bank was being investigated and that Grant's boss went to jail for loan improprieties, all those things. But I couldn't get any of that to touch Grant because I didn't know anything about this. And this should have been disclosed. Or at the very least, it should have been turned over on camera and let the court decide. That never happened until I found out about it after post-trial. And then I asked for it. Now we find out that, indeed, it's there. And the minute the judge heard about it and listened to the recording, he immediately ordered them to turn it over to us. And there wasn't much question in his mind whether or not this had an impact or could have had, whatever the language, a reasonable impact on the jury. He said it did, and that's why he reversed the trial. So at any rate, I suggest that what happened here is my hands were tied behind my back at this trial because I couldn't attack the key witness and, in fact, the only witness the government had to counter my good-faith defense. And because I didn't know anything about this, and I should have known about it, I should have been told about it. At the very least, the— Counsel? I'm sorry, Jim. That's the first time you said that. I'm sorry. You don't have to keep saying it over and over again. All right. I know you're excited about it, but— I am. I apologize. Just I feel that— I feel that— Justice was not done. Yes, I do. I feel strongly about that. That's exactly what I feel. It wasn't because we had an absolute right to know about that information, and we were not given that information. And hence, that's this trial is suspect. It should not have happened the way it did. My client should have been acquitted. Thank you. Mr. Boland? Mr. Miller? The defense's hands were not tied behind their back. In fact, that was part of the problem. The judge allowed the defense to go beyond what it should have been allowed to do with the district court, which was to present this evidence of a corrupt bank, which didn't exist, and to present this claim that the bank officer told him what to do, even though it's clearly under the law not a defense to bank fraud. In the entire argument from the defense, both what they blustered here and blustered in the district court, there's been no articulation of materiality, of how this was material, how it would have been a defense. It wouldn't be. He says the defendant acted in absolute good faith. The law is clear. If you make false representations to the bank, which the defendant did, then you don't have a good faith defense. He says he didn't have intent to defraud the bank. That wasn't an issue. That's under Section 1344-1. This was a case under 1344-2. He says Grant was the only person in the grand jury. That's not part of the record in this case, actually. And he says that he didn't know Grant wasn't charged, but he actually did because he was involved in the Fitz prosecution. Was Grant the only witness before the grand jury? He was not. There were other witnesses before the grand jury? There were other witnesses before the grand jury, yes. But that's not part of the record. So we would ask you to reverse the district court because there's been no showing whatsoever that these statements are material. Thank you. Thank you, Mr. Miller. Thank you, Mr. Beaumont. The case is taken under advisement.